IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT LYNN SMALL,

    Petitioner,               No. 2:06-cv-02172 ALA (HC)

    vs.

D. K. SISTO, Warden,

    Respondent.        ORDER

_____/

    Pending before the Court are Robert Lynn Small's ("Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. §2254(a), filed October 2, 2006 (doc. 1), Respondent's Answer filed February 8, 2008, (doc. 13), and Petitioner's Reply, filed February 12, 2008 (doc. 14). Also, before this Court is Respondent's response to this Court's December 20, 2007 order for briefing on the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007) if any, to this matter (doc. 9). For the reasons discussed below, Petitioner's application is denied.

**I**

**A**

    Pursuant to a plea agreement, Petitioner pled guilty to the crime of murder in the second degree, pursuant to California Penal Code section 187, a lesser included offense in the offense of first degree murder. He was sentenced on March 29, 1989 to serve a term of imprisonment of

fifteen years to life.  In explaining the consequences of the sentence, the trial court informed Petitioner that he "could, in fact, serve the rest of your life in prison if you did not earn the earliest or some later parole date."  The trial court also stated that "when you complete your commitment *and are determined to be eligible for parole by the Department of Corrections Parole Authorities,* you are subject to release on parole for also the balance of your life." (emphasis added).

Petitioner did not file a direct appeal from the judgment of conviction or the sentence.

## II

The probation report prepared for the trial court's sentencing proceedings described Petitioner's crime as follows:

> On July 9, 1988, at approximately 5:30 p.m., fire and ambulance personnel responded to a house regarding a medical call on an infant.  Once at the residence, paramedics were advised by Robert Lynn Small that he was the "foster father" of the 16 month old child.  The infant, born in February, 1987, will heretofore be referred to as Baby J.  Baby J was unconscious and his body exhibited fresh trauma about the face, chest and legs.  Small told medical personnel that he had left the baby in the bath tub where he had placed him to cool off in the water.  Small said he left the baby alone for a few minutes and when he came back, he found the victim floating face up in the bath tub with no signs of life.  Small said he picked the baby out of the tub, removed him to the living room and began mouth to mouth resuscitation while pressing on his chest.  Small said he had no actual CPR experience.
>
> While preparing life saving techniques, the emergency personnel noted the baby was completely dry and he was wearing a clean dry disposable diaper.  The bath tub was dry also, inconsistent with the defendant's account of the drowning.  The defendant said he placed the baby in the tub to cool him off because the weather was so hot.  He left the baby happily playing in the water and went into the kitchen and then outside to feed some puppies.  He checked on the baby when he came back in the house.  About 10 to 15 minutes later he went to check on him again and he found him floating on his back with his eyes open.  He was not breathing.  The defendant said he took the baby out of the tub and into the bedroom where he placed him on the floor at the foot of the bed and pumped water out of him.  He placed the baby face down with this head turned to the side with one hand underneath him and pumped his back with his other hand.  Water and blood came out of his mouth and nose. Small said he then rolled him over and started pumping on his

chest. Baby J started breathing a little bit but seemed as though he were going into convulsions, kicking and moving his arms. Small then took him into the kitchen to make a telephone call for emergency response. He said he continued pumping on the baby's chest until fire personnel showed up. He said he didn't remember putting the diaper on the baby and said he must have let the water out of the tub when he found him floating there. Small attributed the numerous elongated reddish contusions on the baby's chest from his efforts to revive the child.

Emergency personnel summoned police as Small's account of drowning was inconsistent with the injuries observed. Small was arrested on charges of child endangerment after the baby was taken to UCD for treatment.

The defendant was questioned by detectives on the Homicide Assaults Detail at the Hall of Justice around 8:30 p.m. The interview was taped recorded and video taped. Small was initially questioned about the acquisition of the baby. He related that the victim's natural parents, Lisa and Dedrick Easter, live in Washington. They are friends of Small's wife who had taken care of another of Lisa's children previously. The baby's mother phone Small's wife and asked that she take her child as she was having difficulties raising him. Small said he and his wife were given custody of the child for a three year period between March 24, 1988, up to and including March 26, 1991. (Notarized statement - verified). The defendant was questioned about his activities during the day. He said he was alone at home with the baby all day. He has no car and was not working at that time. His wife left for work at about 6:30 a.m. Sometime during the afternoon, Small filled the bath tub with lukewarm water and allowed the 16-month old victim to get in the tub by himself to cool down. Five or ten minutes later, Small returned to the bathroom where he found the child unconscious in the water. Small then repeated in substance the story he had given to emergency personnel. He was still unable to account for the fact that the baby was entirely dry and there were little signs of water in the bathroom. When questioned about the injuries to the baby, specifically the blood that came from baby's ear, nose and eye as well as bruises on his chest, buttocks and burn marks on the inside portion of his thighs, Small replied the baby had fallen out of his bedding and must have hit his left eye on a pair of speakers located nearby. The baby's bed is in a closet on the floor. Small attributed bruises on the victim's neck to the fact that he held him tightly while attempting to revive the baby. Regarding the burns on the inside of the baby's thighs, Small said 1-1/2 to 2 weeks ago the baby must have sat down on something hot. He had no information regarding bruises found on the baby's back. Small denied that he had ever struck the child or lost control. He said he occasionally had a beer or two but denied any involvement in drug usage whatsoever. He also said that no one else had care/custody since he and his wife had received the

3

baby. Small was asked if he had ever been accused of abusing or mishandling children in the past. He replied that when he took care of the baby's brother in Washington State, he had been accused of striking the baby by police. The child had two black eyes but Small said he must have suffered the injuries some time during the previous weekend and not while he was in Small's care. Further, the child suffered what appeared to burns on the side of his face and there was a suspicion that a hot iron had been placed on the baby's face but Small maintained a hot iron fell down onto the victim and caused the burns that way. Small said that he was accused of the mistreatment of the child but was not arrested.

Baby J was admitted to UCD-SMC July 9 in an unconscious state. Although life saving measures were initiated and continued, there was little hope of survival according to the admitting physician. The victim never regained consciousness and was pronounced dead July 12, 1988, at approximately 7:15 p.m. An autopsy was conducted by a medical examiner from the Coroners Office. The medical examiner found bruising along the interior portion of the victim's right eye, right cheek, right and left ears, and multiple areas of bruising over the victim's chest. Additionally, there were areas of bruising over the left shoulder, right chest wall, right elbow, left jaw and upper cheek as well as injuries that appeared to be older and of a different nature. There was noted discoloration of the victim's scrotom, some scarring attributed to some type of burning phenomenon which could have occurred a number of days to weeks prior to the victim's admittance to the hospital. The examiner also noted internal evidence of trauma where bruising had penetrated into the muscles and fat of the chest and shoulder areas. There was some interior bruising present in the left diaphragm and a large area of hemorrhage in the right brain. The examiner noted that when a person is either struck or shaken, certain vessels within the brain are torn and this causes bleeding into the space around the brain which also causes a reaction of increased pressure. This reaction causes an individual to lose consciousness and die. The final cause of death was attributed to complications of multiple blunt force trauma, or subdural hematoma caused by bleeding around the brain as the most lethal of the injuries sustained by the victim. The examiner noted the final trauma must have occurred 12 to 24 hours and most likely less than 12 hours prior to infant's arrival in the emergency room. The examiner also noted that the victim suffered from retinal hemorrhage which is very rare in children and when observed in children it is almost always diagnostic of battered children. Further, the trauma to the victim's ears, eye and cheeks was evidence of force applied to the child's head.

### III

On July 30, 2004, the Board of Prison Terms ("BPT") concluded that Petitioner was not

4

suitable for parole because he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  Petitioner filed a petition for a writ of habeas corpus before the Sacramento County Superior Court challenging the BPT's July 30, 2004 decision. The Sacramento County Superior Court denied his petition on April 28, 2005.  The Sacramento County Superior Court's order reads as follows:

> The petition for writ of habeas corpus has been filed and considered.
>
> IT IS ORDERED that the petition for writ of habeas corpus is DENIED.
>
> Petitioner challenges his July 30, 2004 denial of parole from the Board of Prison Terms (hereinafter "Board").
>
> Petitioner first claims that the Board made findings contrary to and unsupported by the evidence, including that petitioner had committed unproven and uncharged child abuse allegation and that the had an unstable social history.
>
> The claim is meritless.  The Board's findings were all supported by the evidence summarized at the hearing itself.  None of that evidence that was relied upon in the findings was objected to by petitioner or his counsel at the time it was summarized.  The Board first relied on the commitment crime itself, that it had involved obvious child abuse including shaking and blows, and reasonably inferring from the facts that the victim, who was little more than one year in age, must have been crying and screaming as a result of the injuries, and that that showed callous disregard for human suffering.  The Board found the motive trivial, as the crime was abuse of such a young child.  As for any alleged reliance on "unproven" and "uncharged" child abuse allegations, the Board only noted that petitioner had been accused of child abuse in Washington while caring for another child in his custody, and also noted that no charges were filed in the case; that was not a misstatement of any fact, and although so noted does not appear to have been relied upon as any aggravating circumstance.  As for unstable relationships, the Board noted this occurred after the death of petitioner's mother, when he was 13, and that petitioner had no permanent structure thereafter, which was supported by the evidence that he moved from father to sibling to sibling to out of state to yet another state.  The Board also found that petitioner had programmed in a very limited manner while incarcerated and had not sufficiently participated in beneficial self-help or therapy programs, which was supported by a lack of showing at the hearing otherwise; petitioner's showing of having attended a few workshop on sexually-transmitted or needle-transmitted diseases


hardly qualifies as participation in any program which effectively assists an inmate to deal with stresses and dependencies or to give insight and guidance into handling violence in the future.  The Board found the 2000 psychological report was contradictory and did not address many concerns, which was supported by the Board's summary of the report earlier in the hearing.  The Board found that petitioner had an acceptable place to live as a parole plan, but no employment plans although petitioner has marketable skills; this was supported by the evidence.  The Board found that the counselor had opined that petitioner posed a moderate to low degree of threat if released from prison, which was supported by the evidence.  The Board commended petitioner for his being free of "CDC-115" disciplinaries since 1990, but noted that petitioner had been removed from the optical lab where he had been writing prescriptions without a license, which was discussed earlier in the hearing.  As such, "some evidence" supported each factor that the Board relied upon in finding petitioner unsuitable for parole.  Thus, petitioner fails to make a prima facie showing for relief, requiring denial of the claim (*In re Bower* (1985) 39 Cal.3d 865).

Even if the Board had improperly relied upon an uncharged child abuse allegation from Washington, or petitioner's social history, petitioner still would not be entitled to relief on this claim.  The commitment offense alone was sufficient to support the denial of parole, as discussed further below.  Also, petitioner's lack of sufficient self-help and lack of employment plans for parole supported the denial of parole.  When one portion of a parole denial decision is not supported by some evidence, but the remaining portions are supported by some evidence and it is clear that the Board would have reached the same conclusion regarding parole suitability even without the unsupported portion, the parole decision is to be upheld (*see In re Rosenkrantz* (2002) 29 Cal.4th 616, 677).  That is the case here.

Petitioner next claims that the Board improperly relied on the commitment offense and other unchanging factors to deny parole, in violation of federal due process.  He cites *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 in support.

*Biggs v. Terhune* actually held that a California inmate may be denied parole based solely on the commitment offense and prior conduct itself, that it may constitute the necessary "some evidence" to support the finding of unsuitability for parole.  *Biggs* did not state in dicta that at some point in time, if the inmate has been demonstrating exemplary behavior and that he or she has been rehabilitated, that a denial of parole based solely on the commitment offense and prior conduct may raise serious questions.  That, however, was only dicta, and the Ninth Circuit did not elaborate any further on the matter, thus shedding no light on whether, even then, it would indeed constitute a due process violation.

In any event, *Biggs* is not binding on this court. Although Ninth Circuit opinions in general may present persuasive authority on a subject, California courts still may choose not to follow a decision such as *Biggs* (*see generally People v. Bradley* (1969) 1 Cal.3d 80, 86; *see also Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 320, 321 [reaffirming *Bradley* rule]). Rather, California courts are bound under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 to follow the California Supreme Court decisions in *Rosenkrantz*, supra, and *In re Dannenberg* (2005) 34 Cal. 4th 1061, that a denial of parole is not arbitrary and capricious if it is based on "some evidence" to support the conclusion that petitioner would pose an unreasonable risk of danger to society or a threat to public safety if he were to be released from prison at this time, and that the commitment offense alone, when the commitment offense is particularly egregious, may constitute that "some evidence," so long as there is "some evidence" of aggravating facts beyond the minimum elements of that offense. Again, as discussed above, that has been shown in this case, as the murder was of a vulnerable one-year old child who had been severely shaken and beaten, in what must have been a brutal episode involving a great deal of infliction of pain. Therefore, this claim is denied under *Bower, supra*, as well.

Petitioner next claims that the Board violated petitioner's plea bargain, under which petitioner had a legitimate expectation to receive parole. Petitioner claims that the District Attorney, at sentencing, had stated that second degree murder was the appropriate disposition, indicating that petitioner would serve a prison term commensurate with second degree murder and not first degree murder. Petitioner claims that the District Attorney breached the plea bargain by opposing parole for petitioner at prior parole hearings.

There is no evidence to support his claim. The reporter's transcript for the change of plea hearing shows that the trial court explained to petitioner, in accepting the guilty plea, that "your sentence by law is required to be 15 years to life in prison the earliest availability for parole no sooner than having served seven and one half years of that commitment," and that petitioner "could, in fact, serve the rest of your life in prison if you did not earn the earliest or some later parole date." The reporter's transcript for the judgment and sentencing hearing shows that petitioner was sentenced "to State Prison for the term prescribed by law which is 15 years to life in prison," and petitioner was told by the court that "when you complete your commitment and are determined to be eligible for parole by the Department of Corrections Parole Authorities, you are subject to release on parole for also the balance of your life . . . ." That made it absolutely clear to petitioner, at the time that he entered his plea, and even shortly thereafter at judgment and sentencing, when he still had opportunity to move to withdraw his plea, that he was being

sentenced to 15 years to life in prison, that he could serve the rest of his life in prison, and that it would be determined by parole authorities when and if he would ever be paroled.  No promise was ever made to him he would be released on parole within a certain number of years, should he be disciplinary-free or for any other reason.

Nor was there any promise that petitioner would serve a term commensurate with second degree as opposed to first degree murder.  Petitioner was sentenced to 15-years-to-life, the sentence for second degree murder, which gave rise to the reasonable and accurate inference that he would be eligible to be considered for parole after serving 15 years in prison, less credits he was able to earn off that initial 15 years.  If petitioner had been convicted of first degree murder and sentenced to 25-years-to-life, that eligibility would not have occurred until he had served 25 years as opposed to 15.  No aspect of this was violated.

That the Board considered factors involved in the commitment offense that could have supported or indicated that the crime was equivalent to first degree murder does not breach any promise to petitioner, nor was it improper.  In considering the commitment offense for purposes of determining parole suitability, the Board may consider any factor indicated by the evidence, including premeditation and deliberation even if a jury had acquitted of first degree murder and convicted only of second degree murder (*Rosenkrantz, supra*).

Nor did the District Attorney breach the plea bargain by opposing parole for petitioner at prior parole hearings.  There is nothing in the transcripts for either the change of plea hearing or the judgment and sentencing hearing to indicate that the District Attorney had promised, as part of a plea bargain, not to ever oppose parole for petitioner.  Nor is it clear that a District Attorney could make such a promise, without violating public policy.

As such, this claim fails as well under *Bower, supra*, requiring its denial.

Petitioner next claims that the Board violated his due process rights by conducting the 2004 hearing without a current psychiatric report, relying instead upon a recognized incomplete 2000 report.

Petitioner and his counsel at the parole hearing both knew well in advance that petitioner had not undergone a more recent psychiatric report.  Petitioner fails to show that either he or that counsel had ever requested that petitioner be given a new psychiatric report before the 2004 parole hearing, or that the matter had been administratively appealed if it had been denied.  Also, at the outset of the 2004 parole hearing, petitioner and his counsel were specifically asked if they had any objections to any matter

8

> before the Board at the hearing, and neither mentioned the failure to obtain a more recent psychiatric report. As such, petitioner cannot complain that the Board violated his due process rights by not obtaining a more recent report. Thus, this claim fails as well under *Bower, supra*, requiring its denial.

Petitioner filed a petition for writ of habeas corpus before the California Supreme Court dated on October 11, 2005. The California Supreme Court summarily denied the petition.

Petitioner filed a timely application for a writ of habeas corpus before this Court pursuant to 28 U.S.C. § 2254(a).

## IV

### A

Petitioner contends in his application for a writ of habeas corpus that he is entitled to relief on discrete grounds. He alleges that the denial of parole release violated his federal constitutional rights under the Due Process Clause of the Fourteenth Amendment because the record does not contain some evidence demonstrating that he is unsuitable for release on parole. He also asserts that the denial of parole release violated the terms his pre-plea sentence agreement.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

### B

In his answer, Respondent denies that Petitioner is entitled to habeas corpus relief

pursuant to §2254(a) because the United States Supreme Court has not established that a California state prisoner has a liberty interest in parole. Accordingly, Respondent argues that §2254(d)(1) bars this Court from granting Petitioner's application for habeas corpus relief.

The Ninth Circuit has held, however, that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). This Court must follow the Ninth Circuit's instruction in *Sass*. See *Zuniga v. United Cab Co.*, 812 F.3d 443, 450 (9th Cir. 1987) (citation omitted). ("District courts are, of course, bound by the law of their own circuit, and 'are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be.'"). Therefore, this Court must reject Respondent's contention that this Court lacks the power to grant habeas relief in this matter.

### C

Respondent also maintains that "even if Petitioner has a federal liberty interest in parole release, he received all the due process to which he is entitled under clearly established federal law because the Board provided him with an opportunity to be heard and a statement of reasons for the decision." Respondent relies on *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979) for this proposition. In *Sass*, however, the Ninth Circuit held that a parole board's decision that a person serving an indeterminate life sentence is unsuitable for parole must be supported by some evidence that the prisoner will pose an unreasonable risk of danger to society if released from prison. *Sass*, 461 at 1123. This Court must follow the law of the circuit. *See* Yong v. INS, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000) ("once a federal circuit court issues a decision, the district courts within that circuit are bound to follow it.")

### D

In *Irons v. Carey*, 479 F.3d 658 (9th Cir. 2007), the Ninth Circuit held that

> where, as here, there is some evidence to support a finding that
> 'the evidence was carried out in a manner which demonstrates an
> exceptionally callous disregard for human suffering' and the

'motive for the crime is inexplicable or very trivial in relation to the offense; Cal. Code Regs., tit. 15 §2402 (c)(1)(D)- E, we cannot say that the state court unreasonably applied Hill's 'some evidence' principle.

*Irons*, 505 F.3d at 853.

Based on controlling Ninth Circuit authority, this Court must determine whether some evidence supported the BPT's July 30, 2000 decision to deny Petitioner release on parole.

V

The BPT's decision reads as follows:

> **PRESIDING COMMISSIONER DALY:** Okay. We're back on record in the matter of Robert Small. And the Panel has reviewed all of the information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety is released from prison. The offense was carried out in a very cruel manner. It was carried out in a dispassionately and quite calculated in that the prisoner had every opportunity to stop, and he did not. The victim was abused during the offense by being shaken and hit along side of the head, and the offense was carried out in a manner which demonstrated a total and callous disregard for human suffering, as the child must have been crying and screaming as a result of the injuries. The motive for the crime was very trivial in that it would appear the motive for the crime was just that the prisoner became frustrated with the child and ended up abusing it in such a manner that the child died from the injuries. These conclusions are drawn from the Statement of Facts wherein the prisoner on March - - wherein the prisoner on July 9th of 1988 assaulted and abused the victim who was 16 months old by shaking it and hitting it along side of the head, causing severe trauma that resulted in the baby's death three days later. The prisoner has been accused of child abuse when he lived in the state of Washington for another child that was in his custody, but he left Washington State prior to the completion of that investigation and no charges were filed. So he has no previous convictions for child abuse. The prisoner does have a history of unstable relationships, and he has a history of his unstable relationships, including the fact that this family life as he was growing up was quite in turmoil. His mother was quite ill. She died when he was 13 years old. He had no permanent and good support structure, struck out on his own. He was a high school drop out. But he did end up going into the Job Corps and completing a trade and getting his GED. The prisoner has programmed in a very limited manner while incarcerated, and he has not sufficiently participated in beneficial self-help or therapy programs. The psychiatric/psychological report dated September

11

7th of 2000 by Dr. Dean Clair is a very contradictory report. And the report does not address any of the concerns that were spelled out in the 1997 psychological report. But in the report, Dr. Dean Clair says that the 16-year old [sic] was left in the inmate's care. And when he annoyed the inmate with his crying and infantile behavior, the inmate shook him so violently that death followed. The writer has already expressed his concern as to the inmate's mental condition at the time and as to the possible role of psychopathology in the offense. The inmate seems never to have probed this area, and the prison system is weakly equipped to give appropriate help in this regard. The inmate was immediately remorseful following his crime and quickly accepted culpability. And then he said that,

> "Points have already been made that the inmate had no significant criminal history prior to his commitment offense and no disciplinary violations in approximately 11-plus years of prison life. He has never been addictive. He is not subject to psychiatric disorder. He is not a psychopath. The psychological factors that may have contributed to his commitment offense remain a mystery. He is rational and has adequate behavior controls. It is thus almost inconceivable that if paroled he would, in effect, throw away the rest of his life by inflicting gratuitous violence either on a child or on an adult."

And if paroled, the writer sees him as being a negligible risk (indiscernible) dangerousness. I think that this is just so contradictory that it is unable to truly assess the inmate's ability to refrain from violence, especially with children, if released from prison. The parole plans, he does have an acceptable place to live. He does not have acceptable employment plans yet. But it is felt that he has a marketable skill and that he does have a certification in voc masonry that he obtained and that he had also worked in plumbing prior to coming into prison, and he has several certificates in vocational auto body, not a complete overall accomplishment of the program. The Hearing Panel considered the counselor, L. Ramos, R-A-M-O-S, that he still feels the prisoner would pose a moderate towards low degree of threat if released to the public. The Panel finds that the prisoner should be commended for the fact that he hasn't had a 115 since 1990. However, there was some discussion about the June '02 removal from the optical lab where the prisoner initially denied writing prescriptions without a license to do so, but then when confronted with the evidence, admitted that he had written prescriptions when he had no authority to do so, and he was removed from that program. He has just recently taken some workshops, and these are workshops that have to do with sexually transmitted diseases, tuberculosis, HIV, and hepatitis. And these are the only workshops that we see in his history. And I know that the prisoner

indicated that due to budget constraints there was no self-help available. But this prisoner has been in the institution since 1989, and there have been many, many programs available to prisoners. And he just simply has not taken advantage of them. And now at a time when budget constraints are tight, it may be a little bit more difficult. It was also noted that he had his GED that he obtained during the Job Corps of 1980, but there still is no copy or evidence of that in –

**DEPUTY COMMISSIONER ZIEGLER:** I need to clarify that.

**PRESIDING COMMISSIONER DALY:** There is?

**DEPUTY COMMISSIONER ZIEGLER:** I did find a copy of it. It's dated February 3rd, 1982.

**PRESIDING COMMISSIONER DALY:** Okay. In 1982. Okay. Then we do have a copy in the file.

**DEPUTY COMMISSIONER ZIEGLER:** So there is documentation that he did get his GED, did receive his GED.

**PRESIDING COMMISSIONER DALY:** He has been working recently as a stationary engineer. Prior to that, he was in PIA optical, then in Arts in Correction, and then in maintenance and pluming. And the Panel has noted that he has received above average to exceptional work reports practically throughout the duration of his confinement within CDC. However, these positive aspects of his behavior do not outweigh the factors of unsuitability. In a separate decision, the Hearing Panel finds that the prisoner has been convinced of murder, and it is not reasonable to expect that parole would be granted at a hearing during the next three years. The prisoner committed the offense in a very cruel manner. Specifically, he became annoyed with a child who was crying, picked the child up, shook him hit him on the side of the head, and the injuries that were sustained resulted in the baby's death three days later. The offense was carried out quite dispassionately and rather calculated as he continued to shake and hit the baby after the baby was crying. And the victim was abused during the offense by being hit and shaken. The offense was carried in a manner which demonstrated a total disregard for human suffering . Even as the baby cried, he continued to shake and hit the baby. And the motive for the crime was very trivial in relation to the offense in that the motive was simply to shut the baby up. The prisoner has a history of unstable relationships. And a recent psychiatric/psychological report dated 9/07 of 2000 authored by Dr. Dean Clair indicate a need for a longer period of observation and evaluation. The prisoner has not completed the necessary programming which is going to be essential to his adjustment, and he needs additional time to gain programming. He has failed to participate in and complete sufficient self-help programs.

> Therefore, a longer period of observation and evaluation of the prisoner is required before the Board should find that the prisoner is suitable for parole.  And the Panel recommends that the prisoner remain disciplinary - free, and if it is available, upgrade vocationally, and if available, participate in self-help, and then to cooperate with clinicians in the completion of a new clinical evaluation prior to the next hearing.  For Mr. Small to indicate that there is absolutely no self-help available, there were – there are church services on Sunday, or sometimes during the week, but there are also AA and NA programs.  And even though there is no indication that he has had substance abuse, working through the 10 [sic] steps and making sure that he took a look at each step and assessed it to whatever the issues were that caused him to commit this crime in and of itself may be very helpful.  There are also books that he could check out of the library that he could read.  If he does this, he should keep a list of the books and a short summary of what it was that he learned from the books.  So with that we would just wish him luck, and we'll see him in three years.  Do you have any comments?
>
> **DEPUTY COMMISSIONER ZIEGLER:** I wish you luck, too, Mr. Small.
>
> **PRESIDING COMMISSIONER DALY:** Okay.  That concludes the hearing.

## VI

In his application for habeas corpus relief, Petitioner asserts that this Court must grant relief because "[t]he Board is prohibited from relying on the crime or other unchanging factors to deny parole." Application for a Writ of a Habeas Corpus at page 9.  In support of this proposition, Petitioner argues that "by denying parole based on the crime and other underlying factors, the board unlawfully and unreasonably failed to *minimize the risk of error* concerning its decision in petitioner's case." Application for a Writ of Habeas Corpus at page 5.  He cites *Biggs*, 334 F.3d 910 (9th Cir. 2003) for this proposition.  The Ninth circuit expressly rejected this contention in *Biggs*.  The Court *affirmed* the denial of parole in *Biggs* stating: "Section 3041(b) allows the gravity of the offense to be considered in requiring a period of longer incarceration.  The murder of which Biggs was convicted involved killing a witness in a manner which exhibited a callous disregard for life." *Id*. at 916.

/////

**A**

Petitioner's contention that the BPT cannot base its decision on the commitment offense is contrary to California Penal Code section 3041(b).  Section 3041(b) provides that the BPT

> shall set a release date unless it determines the gravity of the offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, or the timing and gravity of current or past convicted offenses is such that consideration of the public safety requires a more lengthy period of incarceration for this individual and that a parole date, therefore, cannot be fixed at this meeting.

Here, the BPT declined to set a release date, in part, because it found that the Petitioner "would pose an unreasonable risk of danger to society or a threat to public safety is (sic) released from prison.  The offense was carried out in a very cruel manner."  The BPT also found that "the offense was carried out in a manner which demonstrated a total and callous disregard for human suffering, as the child must have been crying and screaming as a result of the injuries."  California Code of Regulations §2281 sets forth the circumstances that tend to show unsuitability for parole release.  Section 2281(c)(1) provides as follows:

> (1) Commitment Offense: The prisoner committed the offense in an especially heinous, atrocious or cruel manner.
>
> The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> (C) The victim was abused, defiled or mutilated during or after the offense.
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

The probation officer's report was considered by the BPT.  It demonstrated that Petitioner murdered a helpless, sixteen month old infant in an especially cruel manner.  The medical examiner's autopsy report revealed that the infant had bruises along the interior portion of his right eye, right cheek, right and left ears, and multiple areas of bruising on the left

...
shoulder, right chest wall, right elbow, left jaw and upper check.  The victim's body also had injuries to his body that appeared to be older and of a different nature.  There was discoloration of the victim's scrotum, and scarring" attributed to some type of burning phenomenon which could have occurred a number of days to weeks prior to the victim's admittance to the hospital."  There was also "internal evidence of trauma where bruising had penetrated into the muscles and fat of the chest and shoulder areas."  The medical examiner also noted interior bruising present in the left diaphragm and a large area of hemorrhage in the right brain.  He opined that when a person is struck or shaken, certain vessels are torn which causes bleeding and a reaction of increased pressure.  "This reaction causes an individual to lose consciousness and die."  The medical examiner also noted that the victim suffered from retinal hemorrhage.  "This is very rare and when observed in children it is almost always diagnostic of battered children."

The evidence of the multiple injuries inflicted upon the sixteenth month old infant amply demonstrates that "[t]he offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering."  California Code of Regulations, §2281(c)(1)(D).  Furthermore, Petitioner murdered a helpless infant.  Thus, "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  California Code of Regulations §2281(c)(1)(E).  Thus, the record contains some evidence that Petitioner was unsuitable for parole release because the gravity of the offense against his sixteen month old victim required a more lengthy period of "consideration for public safety."  §3041(b).

In assessing Petitioner's suitability for parole release pursuant to California Code of Regulations §2281(d), the BPT commended Petitioner for the fact that he had not had a 115 infraction since 1990, and has received "above average to exceptional work reports practically throughout the duration of his confinement within CDC."  It also noted, however that he admitted writing prescriptions in the optical lab without a license.  The BPT was also concerned with the fact that Petitioner had failed to take advantage of the "self-help" programs available to prisoners.

The BPT concluded that the "positive aspects of his [prison] behavior do not outweigh the factors of unsuitability. Thus, the record shows that the BPT complied with its duty, pursuant to California code of Regulations §2281(b) to consider "[a]ll relevant, reliable information available to the panel . . . in determining suitability for parole."

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant test is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Sass*, 461 F.3d at 1128 (*quoting Hill,* 472 U.S. at 455-56). "Hill's some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" *Id.* at 1129 (*quoting Hill,* 472 U.S. at 457).

**B**

Petitioner asserts that the BPT violated his state and federal due process rights by conducting a hearing without a current psychiatric report. He has failed to cite any authority to support this contention. Petitioner was represented by counsel at the July 30, 2004 parole release hearing. Counsel was advised during the hearing that a new psychiatric report had not been prepared for the hearing. Counsel did not object nor did he ask for a continuance of the proceedings so that a psychiatric report could be submitted and considered. The Sacramento County Superior Court noted that "[n]one of the evidence that was relied upon in the findings was objected to by the petitioner or his counsel at the time it was summarized. The Sacramento County Superior Court held that because Petitioner's counsel failed to request a new psychiatric report, or interpose an objection to the failure of the BPT to obtain one "he cannot now complain that the Board violated his due process rights by not obtaining a more recent report."

The Supreme Court long ago in *Yakus v. U.S.*, 321 U.S. 414 (1944) instructed that a failure to object may result in a forfeiture of the right to assert a claim of error in subsequent court proceedings. The Court explained this rule in the following words: "No procedural

17

principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Id.* at 444.

Petitioner argues in his application that "parole suitability proceedings are administrative hearing not subject to the formal rules of evidence and appellate procedure." Petitioner's application for a Writ of Habeas Corpus at page 21. Petitioner failed to cite the *Yakus* decision or refer to any United States Supreme Court precedent in support of his argument. This Court lacks the power to reverse the Sacramento County Superior Court's order in the absence of a clearly established decision that shows that its order is contrary to "clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d).

## C

Petitioner also maintains that the BPT improperly relied on uncharged, unproven, and unrelated allegations of past abuse of another child. Because Petitioner failed to object at the parole revocation proceedings, he forfeited his right to seek review of the claimed error before this Court under *Yakus*.

## VII

Petitioner also asserts that he is entitled to be released upon parole because the terms of his plea agreement entitled him to be released "once he met the objective suitability criteria suggesting that petitioner posed no unreasonable danger or threat to society if released from prison he would be granted parole – without opposition from the District Attorney's Office." He argues that the District Attorney's continued opposition to parole and the Board's continued denials violate the implied covenant of good faith and fair dealing. Petitioner's application for a Writ of Habeas Corpus pages 30-31.

The record does not support this contention. At the change of plea hearing, the trial court informed the Petitioner that he "could, in fact, serve the rest of your life in prison if you do not earn the earliest or some later parole date." The prosecutor did not promise, as part of the plea

agreement, to reduce the charge from first degree to second degree murder, or that the District Attorney's office would not oppose Petitioner's release on parole if he was disciplinary free or for any other reason.

The probation officer's report contains a statement from the District Attorney's Office required by California Penal Code § 1192.7(a)(2).  Section 1192.7(a)(2) reads as follows:

> *Plea bargaining in any case in which the indictment or information charges any serious felony*, any felony in which it is alleged that a firearm was personally used by the defendant, or any offense of driving while under the influence of alcohol, drugs, narcotics, or any other intoxicating substance, or any combination thereof, *is prohibited*, *unless* there is insufficient evidence to prove the people's case, or testimony of a material witness cannot be obtained, or *a reduction or dismissal would not result in a substantial change in sentence*.  (emphasis added).

Murder is defined as a "serious" offense in §1192.7(c)(1).

The District Attorney's Office filed the following statement in accordance with §1192.7(a)(2): "The defendant has no known criminal record.  In view of the circumstances surrounding the death of the infant it was felt that a plea to second degree murder was an appropriate disposition.  This plea should not result in a substantial reduction in sentence."  This terse comment makes no reference to parole release.  Unless exceptional circumstances are alleged in a charge of first degree murder, the prosecutor's statement regarding the sentence is accurate for both crimes.  Both first and second degree murder provide for a sentence of life imprisonment, subject to a release on parole after a minimum sentence has been served.  The §1192.7(a)(2) statement contained no promise that the District Attorney's Office would not oppose release on parole after the minimum sentence for second degree murder was served.

Petitioner maintains that he "believed that he would receive parole by virtue of due process of law when eligible or within a reasonable time thereof.  On this basis, petitioner consented to the plea."  Petitioner's Application for a Writ of Habeas Corpus at page 34.  Petitioner's undisclosed intent was not made a part of the plea agreement.

The intent manifested in an agreement is controlling, not the unilateral or private

intention of a party. "[T]he subjective, unexpressed and uncommunicated thoughts of a party are irrelevant to the material issue of the parties' intent." *Union Bank v. Winnebago Indus., Inc.*, 528 F.2d 95, 99 (9th Cir. 1975).

There is nothing in the record which reflects a promise by the prosecutor that Petitioner would be released at any particular time or before the expiration of the life term. As noted above, the trial court expressly advised the Petitioner before accepting his plea that he could be imprisoned for life. Thus, the doctrine of the implied covenant of good faith and fair dealing is inapplicable under these facts.

**Conclusion**

The BPT decided not to set a parole release date in this matter because it considered that the cruel nature of Petitioner's crime of second degree murder was accomplished by repeatedly assaulting, burning, and torturing a sixteen month old infant over a period of time, and was cruel and callous. The BPT's conclusion that Petitioner continues to pose a risk of danger to society, because of his brutal conduct in killing a helpless child is clearly supported by some evidence. The evidence of Petitioner's unsuitability for parole release outweighs the fact that, in some respects, he has performed well in prison, while under the watchful twenty-four hour supervision of armed prison guards, and away from helpless infants.

For the same reasons, the decision of the Sacramento County Superior Court denying Petitioner's state habeas corpus petition was not "contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d).

It is hereby ORDERED that Petitioner's application for habeas corpus relief is DENIED.

DATED: June 25, 2008

/s/ Arthur L. Alarcón
_____
UNITED STATES CIRCUIT JUDGE
Sitting by Designation